## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DESIREE K. CRANE, | CASE NO. 1:14-cv-01097-CCC-GBC |
| Plaintiff, | (CHIEF JUDGE CONNER) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 10, 11, 14, 17 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Desiree K. Crane for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act").  Plaintiff's treating psychiatrist opined that she had marked limitations in handling work stress and maintaining concentration and attention. A state agency psychiatrist opined that she had some moderate limitations in these areas, but not work-preclusive limitations. Thus, a conflict in evidence regarding Plaintiff's mental health abilities existed. An ALJ is entitled to resolve conflicts in evidence in favor of a state agency physician, as long as the ALJ provides a proper reason. Here, the ALJ properly noted that Plaintiff's treating psychiatrist always

rated Plaintiff's attention and concentration impairment not impaired or mildly impaired throughout the treatment record, and never indicated more than moderate impairments in any functional area in the treatment record. Thus, the ALJ properly resolved the conflict in medical opinions in favor of the state agency opinion. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On January 6, 2011, Plaintiff filed an application for SSI and DIB under the Act. (Tr. 175-86). On March 16, 2011, the Bureau of Disability Determination denied these applications, (Tr. 93-110) and Plaintiff filed a request for a hearing on April 13, 2011.  (Tr. 112). On September 21, 2012, an ALJ held hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 29-92). On September 28, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 13-28). On November 19, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on April 4, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-3).

On June 6, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On August 12, 2014, the Commissioner filed an answer and administrative transcript of

proceedings. (Docs. 10, 11). On October 27, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 14). On December 29, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 17). On June 23, 2015, the case was referred to the undersigned Magistrate Judge. Plaintiff did not timely file a reply, and the matter is now ripe for review.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the

claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

Specifically, the Act provides that:

An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and

findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("In making determinations with respect to disability under [the SSI] subchapter, the provisions of sections 421(h), 421(k), and 423(d)(5) shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter").

### V. Relevant Facts in the Record

Plaintiff was born on March 17, 1969 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 22); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a machine feeder, fast food manager, and cleaner/housekeeper. (Tr. 22). Plaintiff continued working full-time in 2007, 2008, 2009, and 2010 despite her mental impairments. (Tr. 198). She was also acting as a caregiver for her mother. (Tr. 664, 670). She earned $19,034.99 in 2006, $19,223.69 in 2008, $17,001.11 in 2008, $11,938.06 in 2009, $11,370.32 in 2010, and $3,798.22 in 2011. (Tr. 198). Her earnings are consistent with her work history report, which indicates that she worked full-time through September of 2010. (Tr. 225). Plaintiff stopped working in September of 2010 when she could no longer lift more than fifteen pounds and began collecting short-term disability and unemployment compensation thereafter. (Tr. 41-47). Plaintiff applied for and received unemployment compensation in the amount of $6,571.00 in 2010. (Tr. 225).

The record contains evidence of psychiatric treatment in 2007, 2008, 2009, and 2010, prior to Plaintiff's alleged onset. (Tr. 646-675). She began taking Buspar in 2007, and reported it helped more "than anything [she was] on before." (Tr. 672). Other medications in 2007 included Wellbutrin, Ativan, and Effexor. (Tr. 670). She reported problems with anxiety, concentration, sleeping, and decreased appetite. (Tr. 662, 664). IQ testing in 2007 indicated that she functioned in the low average intelligence range. (Tr. 560-69). Plaintiff was stable for most of 2009, (Tr. 651-53), but on August 14, 2009, Plaintiff reported she lost her job when the position was eliminated, but she was bidding for another job. (Tr. 650).. (Tr. 650). She reported other stressors and that her life was in a state of flux. (Tr. 649).

In 2007, Plaintiff reported that mother's health was "terrible." (Tr. 669). In September of 2008, she reported that she "takes care of" her mother, so it was hard to take care of herself. (Tr. 664). She reported that she was a "caretaker." (Tr. 660). In March of 2009, she noted that her mother was "sick" and that she "takes care of her." (Tr. 654). In August of 2009, she reported that her mother had "dementia" and was in "home from the hosp[ital]" after being in a "diabetic coma." (Tr. 650).

On October 15, 2009, Plaintiff transferred her psychiatric care to Dr. Jimmy Ibikunle, M.D. where her former psychiatrist took a leave of absence. (Tr. 646-48). She reported lifelong depression with low energy, interest, and outlook. (Tr.

646). She "describe[d] a long history of significant inattention associated with difficulty initiating and completing tasks, easy distractibility, poor focus especially when sustained mental effort is required and being overly forgetful of obligations," and noted that "[t]hese symptoms have markedly improved with use of Adderall XR." (Tr. 646). She reported problems with crowds and interacting with others in public. (Tr. 646). She reported "worry[ing] constantly about her weight" after losing 200 pounds due to gastric bypass surgery. (Tr. 646). Plaintiff indicated she had "no history of inpatient care" and was seeing a counselor. (Tr. 647). Plaintiff reported constantly chewing ice, and chewed ice during her visit. (Tr. 647). Mental status examination indicated:

> [A]n unusual number of items to this visit. She has a backpack, large bag and a purse. In addition, she has a large cup filled with ice and a can of Pepsi. She chews ice cubes for most of the visit which she reports as a chronic pattern. She is alert and oriented to person, place and time. She demonstrates good eye contact. No abnormal body movements are observed. Her speech is normal rate, volume and rhythm and does not appear to be pressured. Mood is "okay" and rates it 5/10 with 10 being the best ever mood. She reports her "whole body" hurts. Affect is constricted. She is somewhat irritated by the request to check her weight for records. She however complies. She denies any thoughts of planned suicide or homicide. She denies hallucination of the 5 senses. Thought process is goal oriented with thought content marked by edginess in relationships and emotional over-reactivity. Insight is limited, judgment is fair.

(Tr. 647). Dr. Ibikunle opined that Plaintiff had "chronic low-grade, but unremitting, depression, chronic anxiety and significant inattention." (Tr. 647). Dr. Ibikunle diagnosed Plaintiff with "Dysthymic Disorder; Attention Deficit

Hyperactivity Disorder, Predominantly inattentive type; Anxiety Disorder, Not Otherwise Specified…[and] Personality Disorder, Not Otherwise Specified with cluster B traits." (Tr. 648). He assessed her to have a global assessment of functioning ("GAF") score of 50. (Tr. 648). He prescribed Cymbalta, Effexor, Adderall, BuSpar, and Lorazepam. (Tr. 648).

The psychiatry progress note form utilized by Dr. Ibikunle instructs him to rate Plaintiff's "symptoms" and "functional impairments" in various areas, specifically anxiety, attention/concentration, hyperactivity, impulsion/aggression, mood disturbance, school and family problems, and suicidal or homicidal ideation. (Tr. 645). Each area is rated as no impairment, mild impairment, moderate impairment, and severe impairments. (Tr. 645). From November of 2009 to March of 2010, Plaintiff had some mild limitations, but no moderate or severe limitations. (Tr. 643-45). She remained on the same combination of medications. (Tr. 643-45). She had moderate anxiety in March of 2010, but by July of 2010, she had no more than mild limitation in any area. (Tr. 641-42). Prozac was substituted for Cymbalta, and her other medications remained the same. (Tr. 641-42). Plaintiff had moderate anxiety on September 9, 2010, and reported stress from her job, but no more than mild limitation in any other area. (Tr. 640). While continuing to work full-time, Plaintiff reported various subjective complaints to Dr. Ibikunle, including high levels of anxiety and irritability, erratic sleep, feeling overwhelmed,

dysphoria, insomnia, confusion, and skin pricking. (Tr. 469, 473, 475, 482-83, 485, 489, 640-42, 644). Counseling records also document subjective complaints from 2010, while Plaintiff continued working, including sleep disturbances, irritability, occasional concentration deficits, feeling overwhelmed, dysphoria, and difficulty sustaining effort. (Tr. 469, 473, 475, 482-83, 485, 489, 640-42, 644). On June 23, 2010, she indicated that she faced "many demands [at] home." (Tr. 475).

Plaintiff alleges onset as of September 19, 2010. (Tr. 34). She asserts that she stopped working on September 22, 2010. (Tr. 34). The same day, she reported to her counselor that she was "overworked" and fatigued. (Tr. 466). On September 28, 2010, presented to physicians at Orthopaedic and Spine Specialists, PC, for back pain. (Tr. 301). She reported that she was "currently working regular duty. This is not a Workers Compensation Claim. Her current occupation is a caretaker." (Tr. 301). On September 29, 2010, she reported to her counselor that she had an excuse for work through October 6, 2010 due to back pain. (Tr. 462).

On October 7, 2010, Plaintiff followed-up at OSS. (Tr. 297). She reported that she was working "with restrictions" as a housekeeper. (Tr. 298). Her mood and affect were "normal." (Tr. 298). On October 27, 2010, she reported to her counselor that she was "on leave." (Tr. 458). On November 4, 2010, she reported that she was not working due to "layoff." (Tr. 295).

On November 8, 2010, Dr. Ibikunle observed moderate anxiety, but no more than mild limitation in any other area, including attention/concentration and mood disturbance. (Tr. 639). She also reported anxiety, agoraphobia, and avoidance to her counselor. (Tr. 457). Her counselor observed that she appeared "physically depressed." (Tr. 462). Plaintiff repeated her report to OSS that she was not working due to "layoff" on December 17, 2010, January 10, 2011, and February 17, 2011. (Tr. 288, 290, 293). Her mood and affect remained "normal." *Id.* On January 6, 2011, Dr. Ibikunle observed mild-to-moderate mood disturbance, but no more than mild limitation in any other area, including attention/concentration and anxiety. (Tr. 638). The same day, Plaintiff protectively filed for benefits under the Act as a result of depression, anxiety, ADD, ADHD, and back problems. (Tr. 94).

On February 20, 2011, Dr. Ibikunle noted that Plaintiff's Prozac had been switched to Celexa, and she no longer had more than mild limitation in any area, with no limitation in attention and concentration. (Tr. 637).

On March 1, 2011, Plaintiff submitted a Function Report. (Tr. 221). She indicated that she began taking Gabapentin in 2004, Effexor in 2006, Buspar and Adderall in 2007, Ativan in 2009, pain medication in 2010, and citalopram on January 1, 2011. (Tr. 221). She reported problems with memory, completing tasks, understanding, and getting along with others. (Tr. 219). She wrote that instructions were "very hard" for her. (Tr. 219). She reported that she can pay attention for "2

seconds." (Tr. 219). She indicated that she does "not do social activities…become[s] paralyzed with anxiety, and a lot of social activities are painful." (Tr. 219). She reported problems getting along with others due to her pain and because she has "OCD and [has] to have things [her] way." (Tr. 219). She reported that she was "terrible" at handling stress and changes in routine and does not get along with authority figures "well at all." (Tr. 219-20). She reported unusual fears and that she no longer had any hobbies due to depression, anxiety, pain, and OCD. (Tr. 218). She reported pain since birth that was constant. (Tr. 222). She indicated that she needed encouragement to take care of daily activities because she was paralyzed by anxiety and depression. (Tr. 216).

On March 5, 2011, state agency psychologist Dr. Douglas Schiller, PhD., reviewed Plaintiff's file and authored a medical opinion. (Tr. 94-105). Dr. Schiller reviewed records from Psychological Associates of Pennsylvania, Dr. Ibikunle, Dr. Czop, Stony Brook Family Medicine, Dr. Rutter, Orthopedic and Spine Specialists, and Plaintiff's Function Report. (Tr. 94-96). He observed that Dr. Ibikunle had noted "moderate" anxiety, but "mild to no limitations" in other areas, in November of 2010, but by February of 2011, she had "mild to no functional impairments." (Tr. 97). He noted that Plaintiff's mood and affect were normal during her January 2011 and February 2011 physical examinations. (Tr. 97).

He opined that Plaintiff was not significantly limited in her ability to handle instructions, make simple work-related decisions, and sustain an ordinary routine without special supervision. (Tr. 101). He opined that she had some moderate limitations in sustaining attention and concentration, working within a schedule, maintaining a schedule, being punctual, working in proximity to others with being distracted by them, completing a workday and workweek without interruption from symptoms and perform without unreasonable rest breaks. (Tr. 101). He explained that Plaintiff's reports and medical records show that her "basic memory and understanding are intact, and hence sufficient for the mental demands of routine work." (Tr. 102). He opined that she had some moderate limitations in working with others, and "the social demands of a work setting would present challenges, [but] her mental condition is not so severe as preclude her involvement in routine" work. (Tr. 102). He opined she had some moderate limitations in responding to changes in the work setting and making goals or plans independently of others. (Tr. 102). He opined that she did not suffer more than moderate limitations in any area. (Tr. 102).

On June 2, 2011, Dr. Ibikunle authored a medical opinion. (Tr. 679). He noted that Plaintiff was taking Adderall, Ativan, Buspar, Effexor, and Wellbutrin. (Tr. 679). He opined that Plaintiff had "fair" or "good" abilities to handle simple, detailed, or complex job instructions, maintain personal appearance, behavior in an

emotionally stable manner, react appropriately in social situations, and interact with coworkers, supervisors, and the public. (Tr. 677-78). However, he opined that she had "poor to none" abilities to deal with work stressors or maintain attention and concentration. (Tr. 677). He opined these limitations had existed since 2009. (Tr. 680).

On April 20, 2011, Plaintiff's counselor suggested Plaintiff take part in vocational rehabilitation, but she was "resistive." (Tr. 709). From April 27, 2011 to January 9, 2012, Plaintiff reported mood disturbance, poor concentration, depression, poor outlook, history of thoughts of self-harm, and obsession with weight gain, to Dr. Ibikunle. (Tr. 778-83). During the same period, Plaintiff reported subjective symptoms of feeling overwhelmed, increased depression and isolation, high levels of anxiety, concentration difficulties, decreased energy, daily panic, sleep disturbances, dysphoria, and suicide ideation to her counselor. (Tr. 686-87, 693, 700-02, 707-09). She went to tanning salons at least through April 2011, when her budget no longer allowed for it. (Tr. 704). In June of 2011, she reported difficulty with sustained effort, but was able to pursue appointments, she had accomplished her goal of obtaining a printer, and her mood was improved. (Tr. 705). In July of 2011 she reported increased well-being with a "break from" individuals who were a source of anxiety and chaos. (Tr. 699). In August of 2011, after Plaintiff's disability application had been denied, her counselor noted that he

"again recommended" vocational rehabilitation. (Tr. 696). She continued reporting stress from her "mother's issues." (Tr. 708).

In October of 2011, Plaintiff reported a period of chaos due to enabling behaviors with a "friend." (Tr. 691). She frequently references an individual named "Jen" in the records. (Tr. 696). Plaintiff reported having a gun in her home, and her counselor contacted her brother to have it removed. (Tr. 686). In January of 2012, Plaintiff's counselor observed that she was distraught and she reported irritability, feeling overwhelmed, dysphoria, and anxiety. (Tr. 681-82).

From November of 2009 through January of 2012, Dr. Ibikunle changed or adjusted Plaintiff's medications nine times. (Tr. 637-40, 642-43, 648, 779, 783). From April 27, 2011 to January 9, 2012, Dr. Ibikunle's psychiatry progress notes indicate "mild" or "moderate" functional impairments, but no severe functional impairments. (Tr. 778-83).

From April 13, 2011, to January 6, 2012, Plaintiff continued following up at OSS. (Tr. 710-40). She reported that she was not working due to a "layoff" and had "normal" mood and affect at each visit, specifically April 13, 2011; June 8, 2011; July 1, 2011; August 22, 2011; September 19, 2011; October 18, 2011; and January 6, 2012. *Id.*

The record contains essentially no evidence of mental treatment from January of 2012 through September 28, 2012, the date of the ALJ decision. (Tr.

13-28). On April 26, 2012, Dr. Ibikunle filled out a check-box form that Plaintiff was temporarily disabled from April 26, 2012 through May of 2013. (Tr. 784-85). The record contains a health summary from her primary care provider dated September 17, 2012, that noted Plaintiff's weight, body mass index, blood pressure, and immunization history. (Tr. 786).

On September 21, 2012, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 29-92). She testified that she had her mental impairments all of her life, but was now unable to work because they had gotten "a thousand times worse" over the previous five years. (Tr. 43). Plaintiff testified that she did not "drive much at all" because she was afraid to go out of the house, and did not care for her own personal hygiene on a regular basis. (Tr. 48). She testified that her mental impairments limited her to shopping twice a month for fifteen minutes, and bought only soda, eggs, cheese, and Atkins bars. (Tr. 52). She testified that she had no friends and socialized only with her mother and sister. (Tr. 53). She testified that her agoraphobia and fear of people started four years earlier, and had progressively gotten worse. (Tr. 54). She testified that she goes to doctor's appointments every day, but does not get dressed, and wears her pajamas. (Tr. 58). She testified that she only styles her hair once every three months and only brushes her teeth twice a week. (Tr. 58). She reported problems concentrating while watching television. (Tr. 60). She testified that her medications made her sleepy

and fatigued. (Tr. 66). She testified that she was unable to be outside, around people, watch the news, or read the newspaper due to her mental impairments. (Tr. 69). Plaintiff also testified that physical limitations affected her personal care and daily activities. (Tr. 47-50). She testified that, after she left her last job, pain throughout her body had gotten worse. (Tr. 62).

Plaintiff testified that she was "fired" in 2010 because she "couldn't do [her] job." (Tr. 35). Plaintiff testified that she left her job as a housekeeper because she was restricted to lifting fifteen pounds, so her employer fired her. (Tr. 43). When asked what prevented her from continuing that job, she identified the lifting restrictions, but no mental limitations. (Tr. 60). She testified that, "almost the whole time" she worked as housekeeper from 2005 to 2010, she was "on FMLA." (Tr. 83-84).

Plaintiff testified that she began collecting unemployment after she left her job, and was still receiving it on the date of the hearing. (Tr. 44). She testified that, every two weeks, she stated that she was able to work and available to work in order to obtain unemployment compensation. (Tr. 45). The ALJ asked her "why [she] would lie and say [she was able to work] to get the benefits," and she explained that she had "no other income." (Tr. 45). The ALJ explained that, "if [Plaintiff was] willing to lie to them, [the ALJ has] to figure out if [she is] going to lie to [the ALJ] so that [she] can get money from…Social Security." (Tr. 45).

Plaintiff reiterated that she had no other income, but admitted that she was able to live with her mother, collect food stamps, and had medical insurance throughout the relevant period. (Tr. 45-46). She testified that she was still living with her mother, and had lived with her mother throughout the relevant period. (Tr. 41). Plaintiff testified that her mother, who was eighty years old, was able to care for herself. (Tr. 47).

The ALJ issued the decision on September 28, 2012. (Tr. 24). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 19, 2010, the alleged onset date, and was insured[1] through December 31, 2014. (Tr. 18). At step two, the ALJ found that Plaintiff's degenerative disc disease, affective disorder, anxiety disorder, personality disorder and attention-deficit disorder were medically determinable and severe. (Tr. 18). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 18). The ALJ found that Plaintiff had the RFC to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) subject to the following. She must be able to alternate sitting and standing at her discretion; is limited from above-shoulder reaching bilaterally; limited to occasional crouching, squatting, stooping, bending, balancing, and stairs/ramps; and must not climb ladders, ropes or scaffolds. Additionally, due to pain and other issues, the claimant is limited to

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 20 C.F.R. §§ 404.130-134.

understanding, remembering and carrying out simple instructions with GED reasoning of 111 or 222; occasional decision making on simple work-related decisions; occasional workplace changes; no public contact; and occasional interaction with coworkers and supervisors.

(Tr. 20). At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. 22). At step five, the ALJ relied on the vocational expert testimony and found that Plaintiff could perform other work in the national economy. (Tr. 23). Accordingly, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 23).

## VI.  Plaintiff Allegations of Error

### a.  Assignment of Weight to the Medical Opinions

Plaintiff asserts the ALJ erred in assigning more weight to Dr. Schiller's medical opinion than Dr. Ibikunle's medical opinion.  (Pl. Brief).

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). "Regardless of its source, [the Commissioner] will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). If a treating source is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). Here, Dr. Ibikunle's opinion was inconsistent with Dr. Schiller's opinion, so it was not entitled to controlling weight. *Id.*

When the Commissioner does not give a treating "opinion controlling weight under paragraph (c)(2) of this section, [the Commissioner] consider[s] all of the following factors in deciding the weight we give to any medical opinion." 20 C.F.R. § 404.1527(c). Specifically, "[w]hen [the Commissioner does] not give the treating source's opinion controlling weight, [the Commissioner] appl[ies] the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of [Section 404.1527], as well as the factors in paragraphs (c)(3) through (c)(6) of [Section 404.1527]in determining the weight to give the opinion." 20 C.F.R. § 404.1527(c)(2).

Section 404.1527(c)(2)(i) provides that, "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." *Id.* Section 404.1527(c)(2)(ii) provides that "more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." *Id.* Section 404.1527(c)(1) provides that, "[g]enerally, [the

Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.*

Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

A non-treating opinion may be assigned more weight than a treating opinion. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.). The Regulations provide that, "[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if *it* were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i) (emphasis added). Thus, when a treating source opinion is not given controlling weight, it does not trump all opinions from a nontreating source. It merely receives more weight than it

otherwise would if it were authored by a non-treating physician. However, if the examining or non-examining opinion is better supported, more consistent with evidence, or authored by a specialist, then it may be entitled to greater weight than a treating opinion. As the Third Circuit explained in *Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991):

> Jones next argues that the law of this Circuit required the ALJ to adopt the judgment of Jones's treating physicians, who opined that Jones's illnesses prevent him from maintaining gainful employment and cause him severe pain. Jones claims that the ALJ substituted the ALJ's own lay observations of Jones's condition for the findings of Jones's treating physicians, thus violating *Frankenfield v. Bowen*, 861 F.2d 405 (3d Cir.1988). In *Frankenfield*, we established that, in the absence of contradictory medical evidence, an ALJ in a social security disability case must accept the medical judgment of a treating physician. However, the opinions offered by Jones's treating physicians were conclusory and unsupported by the medical evidence, and failed to explain why ailments that had plagued Jones for decades did not incapacitate him until 1987. Further, these opinions were not uncontradicted. After Jones applied for reconsideration of the initial rejection of his claim, two physicians in the state agency evaluated the medical findings of Jones's treating physicians and concluded that those findings did not reveal any condition that would preclude gainful employment. In light of such conflicting and internally contradictory evidence, the ALJ correctly determined that the opinions of Jones's treating physicians were not controlling. *See, e.g.*, *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir.1990); *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir.1985).

*Id*. at 128-29. *See also Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (An ALJ "may choose whom to credit" when a treating physician opinion conflicts with a non-treating physician opinion, and may "reject 'a treating physician's opinion outright…on the basis of contradictory medical evidence.'") (quoting

*Plummer,* 186 F.3d at 429)); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361

(3d Cir. 2011) ("Although treating and examining physician opinions often deserve

more weight than the opinions of doctors who review records, *see, e.g.,* 20 C.F.R.

§ 404.1527(d)(1)-(2), '[t]he law is clear ... that the opinion of a treating physician

does not bind the ALJ on the issue of functional capacity'") (quoting *Brown v.*

*Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir.2011)).

Here, the ALJ evaluated each medical opinion, acknowledged the conflict in

medical opinions, and resolved the conflict in favor of Dr. Schiller:

> In June 2011, Dr. Ibikunle, the treating psychiatrist, assessed the
> claimant poor or no ability to maintain attention/concentration and
> deal with work stress. Dr. Ibikunle stated these limitations have been
> present since 2009 (Exhibit 10F). The undersigned gives little weight
> to these limitations, which suggest substantial loss in her ability for
> competitive work (Social Security Ruling 85-15), since they are
> unsupported by his treatment records and other evidence in this case.
> The progress notes indicate medications are generally effective in
> controlling symptoms with no significant functional problems or
> clinical observations noted during visits or in the therapy records.
> Further, the claimant worked despite her mental health disorders for
> many years (including a year after Dr. Ibikunle states these were
> present), which ended due to physical limitations stemming from pain.
> Dr. Ibikunle completed another assessment in April 2012 declaring
> the claimant temporarily disabled until May 2013 (Exhibit 15F). The
> undersigned gives notes this is for welfare-public assistance, which
> has different program standards, and gives it little weight because the
> progress notes and other evidence does not support the claimant is
> disabled. The undersigned gives greater weight to the opinion of the
> state agency psychologist that the claimant is capable of performing
> basic mental activities on a sustained basis despite her mental
> impairments, since it is more consistent with the record as a whole
> (Exhibit 2A).

(Tr. 22).

The ALJ properly concluded that Dr. Ibikunle's progress notes show that "medications are generally effective in controlling symptoms with no significant functional problems or clinical observations noted during visits or in the therapy records." (Tr. 22). Plaintiff asserts that this was an error, focusing on Plaintiff's medication changes from November of 2009 to January of 2012. (Pl. Brief at 12-15). However, Plaintiff ignores the key portion of this finding: Dr. Ibikunle rated Plaintiff's functional impairment at every visit in a variety of areas, and never noted more than moderate functional impairment, despite medication changes. *Supra.* Plaintiff acknowledges that Dr. Ibikunle rated Plaintiff as "impaired" at various times, but fails to acknowledge that he rated the severity of her impairment each time. (Pl. Brief). In attention and concentration, he never noted more than mild functional impairment. *Supra.* He occasionally noted moderate anxiety or moderate mood disturbance, but these impairments were typically noted as mild. *Supra.* The only time he noted any serious impairment was in October of 2009, when he assessed at GAF of 50, but Plaintiff continued working full-time for many months after that and stopped due to physical, not mental, limitations. *Supra.* Thus, the ALJ correctly concluded that there were no significant functional problems noted during visits. (Tr. 22). This was a proper reason to assign greater weight to Dr. Schiller's opinion than Dr. Ibikunle's opinion. *See* 20 C.F.R. §1527(c)(4);

*Cosmas v. Comm'r of Soc. Sec.*, 283 Fed.Appx. 976, 978 (3d Cir. 2008) (ALJ properly found only slight mental limitations where claimant demonstrated depression, but "the balance of the mental status examination was normal, since the claimant was oriented in three spheres, his speech was intact, he had good judgment and he was not suicidal.").

The ALJ also correctly noted that Dr. Ibikunle's opinion was not based on clinical observations. (Tr. 22). As discussed above, although Plaintiff reported many subjective complaints, there were few significant objective clinical observations. *Supra.* When a physician's opinion is based on subjective, rather than objective, information, and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Craig v. Chater,* 76 F.3d 585, 590 n. 2 (4th Cir.1996). An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003). Here, Plaintiff has not challenged the ALJ's credibility finding. (Pl. Brief).

The ALJ discounted Plaintiff's credibility by citing to various inconsistencies. noting that the medical records showed she cared for her elderly mother since 2007, although she testified in 2012 that her mother was self-sufficient. (Tr. 21). The ALJ noted that, although she claimed disabling agoraphobia as of September of 2010, the medical records showed that she continued going to tanning salons until April of 2011, when her budget no longer allowed her to do so. (Tr. 21). The ALJ correctly noted that Plaintiff's medical records showed that she lost her job due to layoffs, but she testified that she lost her job due to her medical condition. (Tr. 21, 288-301, 710, 712, 715, 718, 721, 724, 727, 729). The ALJ noted that she represented that she was "able to work" to receive unemployment because she "needed money," but asserts in her disability application that she was not able to work. (Tr. 21). The ALJ noted that "[t]here is no indication the claimant was discouraged from working from a mental health standpoint. Rather, there are multiple recommendations for OVR implying the ability to work (Exhibits 6F, 8F, 11F)." (Tr. 22).

These inconsistencies are all accurate characterizations of the record and appropriate reasons to find Plaintiff less than fully credible. SSR 96-7p. *See Bennett v. Colvin*, 609 Fed.Appx. 522 (9th Cir. 2015) ("Bennett's work history and layoff date were sufficient reasons to support the ALJ's adverse credibility determination.") (citing *Bray v. Comm'r of Soc., Sec. Admin.,* 554 F.3d 1219, 1227

(9th Cir.2009)); *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir.2001)); *Faria v. Astrue*, 5:10CV00076, 2011 WL 3715089, at *4 (W.D. Va. Aug. 24, 2011) *report and recommendation adopted*, 5:10CV00076, 2011 WL 4351602 (W.D. Va. Sept. 14, 2011) ("[T]he ALJ specifically noted that the plaintiff's claim of an inability to perform any work since February 2006 was contradicted by the fact that she stopped working that month due only to a layoff, not due to any identified medical condition, and that her claim was equally inconsistent with her collection of unemployment and certified readiness and ability to work from March through November 2006…Thus, the ALJ thoroughly considered the record as a whole and gave valid reasons for his finding that the plaintiff's statements about her inability to work and about the intensity, persistence limiting effects of her symptoms not to be 'credible.'"). The ALJ "properly discounted" her credibility, so the ALJ was entitled to assign less weight to Dr. Ibikunle's opinion on the ground that it was not based on objective observations. *Morris,* 78 Fed.Appx. at 824-25.

Plaintiff cites a variety of subjective complaints and objective findings. (Pl. Brief at 6-10). However, essentially all of these complaints and findings were present in the records reviewed by Dr. Schiller, who opined that they caused moderate, but not work-preclusive, limitations. (Tr. 94-111). The Court is not empowered to reweigh this evidence. *See Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is empowered to

weigh the evidence or substitute its conclusions for those of the fact-finder.")
(citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *Chandler v. Comm'r
of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to re-
weigh the evidence or impose their own factual determinations") (citing
*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Two medical professionals interpreted the objective medical evidence and
subjective complaints. One medical professional, Dr. Ibikunle, opined that the
objective medical evidence and subjective complaints indicated work-preclusive
impairments. Another medical professional, Dr. Schiller, opined that she had
moderate, but not work-preclusive, complaints. The ALJ resolved the conflict in
favor of Dr. Schiller. The ALJ concluded that Dr. Ibikunle's assessment of marked
limitation was inconsistent with the functional ratings in his progress notes, which
indicated no more than moderate limitation. The ALJ concluded that Dr. Ibikunle's
opinion was not based on "clinical observation" or objective evidence, and
Plaintiff's subjective claims were not fully credible. Plaintiff presents the same
evidence on Appeal that was presented to Dr. Schiller, and does not provide
sufficient reason to conclude that the ALJ did not reasonably rely on Dr. Schiller.

Finally, Plaintiff asserts that the ALJ "failed to consider" the relevant
factors, specifically treating history and specialization. (Pl. Brief at 12-15). The
Regulations require the ALJ to "consider" each factor in assigning weight to the

medical opinions. 20 C.F.R. §404.1527(c). Plaintiff does not cite any evidence that the ALJ did not consider these factors. Presumably, Plaintiff is arguing that because the ALJ did not cite these factors, the ALJ did not consider these factors. However, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR 06-3p. *See also Phillips v. Barnhart,* 91 Fed.Appx. 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it") *quoting Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998). In other words, the word "consider" has been construed by the Commissioner and courts to not require citation or written explanation. *Id.* Thus, an ALJ does not need to cite each factor considered in the analysis. *See Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed.Appx. 802, 804-05 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis. Here, the ALJ acknowledged Dr. Wakham's role as Francis's "treating family osteopath." In assigning no weight to his opinion, the ALJ cited the opinion's inconsistency with the objective medical evidence, Francis's conservative treatment and daily activities, and the assessments of Francis's other physicians. Procedurally, the regulations require no more.") (internal citations omitted).

If explanation allows meaningful judicial review, it suffices. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."); *Hur v. Comm'r Soc Sec.*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record").

Here, as discussed above, the ALJ's explanation sufficed for meaningful review. *Supra.* The ALJ provided specific explanations supported in the record and cited to specific treatment notes that contradicted the opinions. *Supra.* Thus, the Court finds no merit to this allegation of error.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: September 15, 2015        _____s/Gerald B. Cohn_____

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE